16765

PADGETT v. CALVERT FIRE INS. CO.
(77 S. E. (2d) 219)

See also, 221 S. C. 166, 69 S. E. (2d) 565.

*Mr. Henry T. Gaud,* of Charleston, *for Defendant-Appellant,*

*Messrs. Padgett & Moorer,* of Walterboro, *for Plaintiff-Respondent.*

*Mr. Henry T. Gaud,* of Charleston *for Defendant-Appellant, in reply.*

July 20, 1953.

BAKER, Chief Justice.

This action (commenced June 25, 1951) is based upon an automobile collision policy ($100 deductible) issued by the appellant insurance company to the respondent covering his Packard automobile. The Commercial Credit Company held, by assignment, a purchase money mortgage over this automobile, and was by reason thereof made a party defendant, but in fact, was a defendant in name only. Said last mentioned company took no part in the trial of the case, but thereat it was stipulated it should receive the first $200 of any recovery by the respondent. The respondent's complaint alleged that his said automobile had been damaged as the result of a collision with a loose object on a highway of this State on October 28, 1950.

The answer of the appellant admitted the issuance of the policy of insurance and that it was in force at the time of the alleged collision, but denied that respondent's automobile

was in collision with any object on the highway; alleged that respondent drove his car off the highway and ran into, over and upon an object which damaged and made a hole in the oil pan, and although he knew, or from circumstances should have known that the said damage would cause the oil to drain from the crankcase, causing the cylinders, piston rings, bearings and other parts of the engine to become burned, seared and ruined, he nevertheless, without taking any precautions whatsoever for the safety and preservation of the said engine and its parts, continued to drive the automobile over and along the highway, thereby causing any injuries which the engine suffered.

During the trial, and for the first time did appellant admit any liability under its policy, and then only for the damage to the oil pan, taking the position that any damage over and above that was due to the failure of the respondent to protect the engine from further damage following same, under the terms of the policy.

Summarizing the testimony: On October 28, 1950, respondent drove his 1949 Packard automobile, which he had theretofore purchased from Miserendino Motor Co., of Charleston, S. C., from that point to Walterboro, S. C., at which time the engine or motor "was in excellent shape." It had rained practically the entire afternoon, and when the respondent was attempting to return to Charleston about midnight of the same day, there was a lot of water on the highway in several places, the edge of the road was almost covered with water, making it near to impossible to see where it was, and as he was trying to drive close to the edge, ran off on several occasions. There were limbs from trees and other objects that may have been in the road which bumped against the bottom of his car, but not with sufficient force to cause him any concern. It continued to rain and respondent drove on, although soon thereafter the engine commenced to make a noise, and shortly it refused to function further. When this occurred respondent waved a passing automobile, and the occupant of the passing car, who had in

his car a towing chain, being a good Samaritan, towed the respondent and his car back to Walterboro and to the garage (which was closed for the night) of R. F. Smith, where it was left until the following morning. The next morning, upon going to Mr. Smith's garage, respondent found that a hole had been knocked in the oil pan of the car, that all of the oil had leaked out, and having driven the car in this condition, the engine had "frozen." When Mr. Smith undertook to put oil in the car, it ran out through the hole in the oil pan as fast as he poured it in.

"A lot of things can happen when the oil gets out of the motor. You get metal against metal; it galls your pistons and you stick them up. You gall your crankshaft also. * * * everything goes bad within a few miles after the oil runs out." An engine gets excessively hot when operated without oil, the various parts get scorched and burned, and it refuses to function and "freezes." "There are two ways you can repair it. One you can bore the block, then put pistons in it— that is, by putting new pistons and a new crankshaft and new parts all the way through, but that will cost more than getting a skeleton block to be placed in the automobile which is a factory-built motor all keyed up and ready to go in the car. You can use the same pins, the fly wheel, and you can put that into the new skeleton motor, but if you go ahead and buy the new parts they will cost much more than using the skeleton block which is already factory built." The repair job to which the testimony just above quoted refers includes the replacement of piston and piston rings, which was not done in the repair job hereinafter referred to, and respondent's expert witness in testifying thereabout, stated that generally new pistons and rings were needed, but that this would depend on how much damage had been done, and not having seen this engine he couldn't say whether these new parts were needed—they may not have been needed.

Upon respondent learning of the damage to his car on the morning following the accident, he had Miserendino Motor Company of Charleston, the Company from whom he pur-

chased the car, tow it from Walterboro to Charleston, and undertake to repair the damage, which it did, supplying the new parts necessary "so far as it was concerned," all at a total cost to respondent, including the towing charges, of $282.39. However, the engine never thereafter performed in a satisfactory manner, and a reasonable inference from the testimony in the record is that the respondent finally permitted Commercial Credit Company to repossess the car and and sell same towards the satisfaction of the mortgage thereon. In fact, the respondent, in effect, so testified.

Under the contract of insurance, it was the duty of the appellant insurance company to have the engine of this car put in as good condition as it was prior to the damage thereto, when notified of the damage, and if such was necessary, to have installed therein a new motor which would have cost $492.40. So far as the record discloses, the appellant was not notified of the damage, and was not given the privilege of electing which it would do, that is, whether it would undertake to have the engine repaired or replace it with a new motor, until after the engine had been repaired and failed to function satisfactorily, at which time the respondent then demanded that it have installed therein a new motor, which demand was refused. So far as the record discloses, this was the first and only demand made of appellant.

The respondent testified that he did not have a more thorough repair job done on this engine because what was done thereto was all he was able to pay for, and yet it does not appear that the appellant was ever called upon to pay for a repair job, and at no time thereafter did the respondent complain to the company making the repairs that its work thereon was unsatisfactory. Why the respondent did not, prior to incurring the expense he did in undertaking to have his motor or engine repaired, or giving appellant the right of election as to whether it would have the same repaired or a new engine installed in his car, is unexplained. The fact that respondent did not forthwith call upon appellant to comply with its contract, but on the contrary under-

took to have mechanics of his choice to repair the engine, must enter into our deliberations, although the action is not defended on any such ground. It was only after the jury rendered a verdict in favor of respondent and against the appellant for $582.39 that appellant admitted any liability other than for the repair of the oil pan, a negligible item, and then such admission was left-handed. It was on the motion for a new trial that it was admitted that respondent's damage was the amount of the repair bill, $282.39, less $100 deductible, or $182.39, and that appellant was liable in the last mentioned amount under the terms of its policy.

Appellant states the "Questions Involved" to be:

"1. The Court erred in admitting testimony as to the cost of a new motor since there is no evidence that a new motor was required to restore the car to the condition it was in before the accident.

"2. The Court erred in refusing the Motion to reduce the verdict to $182.39, or in the alternative to grant a new trial, since there is no competent evidence of any damages beyond the repair bill."

These two questions are argued together.

There is testimony that the repair job did not put the motor or engine in the same condition it was in prior to the damage thereto in that it did not have as much power, and used considerable oil. The inference could be drawn from this testimony that new pistons and piston rings should have also been installed, and the block bored to accommodate the new pistons, but this was not done. There was also testimony, as aforestated, that it was cheaper to install a new motor than to purchase and install the new parts necessary to an adequate repair job, as a rule.

The trial Judge did state, as argued by appellant, "that testimony about using oil and did not perform like he wanted it to perform is too far removed in my opinion," but he was then ruling as to the elements of damage. But he clarified this in his later ruling when discussing with appellant's coun-

sel his motion for a new trial, in the statement following: "Also, that his car used a great deal more of oil than it used prior to that and had lost a great deal of its power. The point that you mentioned was too remote and my recollection was this, and of course the record will reflect it. I mean the fact that he might have disposed of it some time after that which I do not think is an element of damages. However, I do think it is an element of damages as to the policy which would require the replacing of those parts to make him whole, so to speak, or reasonable in the same condition he was in prior to the collision.

"Now, the evidence as to the condition of that car after he spent those monies on it and the fact he testified even after spending that, that his car was using considerably more oil than it was before—was not giving the power that it should and it would be some evidence that of course his car was not in the same condition that it was prior to the collision."

The record before us is far from an adequate one and in many instances is apparently inaccurate. There are too many disconnected statements attributed to the trial Judge, and in a discussion between the trial Judge and appellant's counsel on his cross-examination of the respondent, such counsel stated: "I am sorry, your Honor please, you will recall that he testified this morning about the loss of power and he has admitted that the loss of power occurred *after these two accidents*." (Emphasis added.) There is no *testimony* of any accident other than the one occurring on October 28, 1950.

As was stated in *Greenwood Mfg. Co. v. Worley*, 222 S. C. 156, 71 S. E. (2d) 889, 892, "The Supreme Court may affirm *nisi*, where damages improperly allowed can be segregated" [citing authorities].

Upon the unsatisfactory record before us, we have reached the conclusion that, unless within ten days after the filing of the remittitur herein with the Clerk of Court for Colleton County, the respondent remits upon the record all of the judgment except the sum of $517.40 (the cost of a new mo-

tor and installing same, and towing charges of $25, less the sum of $100, deductible under the policy, that is, $417.40, the judgment of the lower Court be reversed and a new trial granted; but that if he so remits all of said judgment except the amount above stated, then the judgment is affirmed.

Affirmed *nisi*.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.